GANDÍA, DEMANDANTE–APELADO–APELANTE, *v.* TRÍAS Y STUBBE ET AL., DEMANDADOS, Y APELANTE EL SEGUNDO.

APELACIONES procedentes de la Corte de Distrito de San Juan, Sección Segunda, en pleitos sobre liquidación de sociedad mercantil.

Nos. 2118 y 2187.—Resueltos en julio 5, 1921.

SOCIEDAD MERCANTIL—PROPIEDAD SOCIAL—INTERÉS DE LOS SOCIOS—LIQUIDACIÓN. —Cada socio es dueño de toda la propiedad social, sujeta ésta a igual do-

minio por parte de cada uno de los otros socios. Ningún socio puede hacer absoluto su dominio sobre parte alguna de la propiedad social, sin el consentimiento de los otros socios. El interés individual de un socio en el activo social se determina mediante una liquidación de la sociedad.

IL.—DISOLUCIÓN DE SOCIEDAD—SOCIOS—RECLAMACIÓN DE BIENES ADJUDICADOS.— Cuando como en este caso se ha otorgado la escritura de disolución de una sociedad mercantil y se han repartido y adjudicado en ella, previo balance e inventario, todos los bienes susceptibles de división y adjudicación inmediatos, cualquiera de los socios tiene derecho a reclamar judicialmente los bienes que le fueron adjudicados.

DAÑOS Y PERJUICIOS—ALEGACIONES—FRAUDE.—Para juzgar si existe o no causa de acción, debe acudirse a los hechos alegados, sin que importe si la acción fué o no calificada erróneamente. Tampoco importa que se haya probado o no el fraude alegado si los hechos en sí mismos, prescindiendo de si fueron o no ejecutados fraudulentamente, constituyen una buena causa de acción.

ID.—LIQUIDACIÓN—LIQUIDADORES—SUS OBLIGACIONES.—El hecho de que un liquidador de una sociedad renuncie su cargo, no le exonera de las obligaciones contraídas durante el tiempo en que estuvo al frente de la liquidación, siendo una de ellas el rendir cuenta detallada y justificada de la inversión de los dineros que llegaron a su poder como tal liquidador.

ID.—SENTENCIA—PRONUNCIAMIENTOS DISTINTOS DE LOS SOLICITADOS.—Procede hacer en la sentencia pronunciamientos distintos de los solicitados por las partes, cuando dichos pronunciamientos están necesariamente comprendidos en las peticiones de las mismas y se encuentran justificados por las alegaciones y las pruebas.

Los hechos están expresados en la opinión.

Abogado del demandante-apelado-apelante: *Sr. José de Guzmán Benítez.*

Abogados de los demandados y apelante: *Sres. C. Coll Cuchí* y *G. Cruzado Silva.*

EL JUEZ ASOCIADO SR. DEL TORO, emitió la opinión del tribunal.

Pedro Gandía Córdova presentó en la Corte de Distrito de San Juan, Sección Segunda, una demanda contra Arturo Trías y Johann D. Stubbe, sobre ''liquidación de la sociedad mercantil Gandía & Stubbe, destitución del liquidador Arturo Trías e indemnización.''

Contestaron los demandados. Se celebró el juicio, practicándose una larga prueba de testigos, peritos y documentos y la corte finalmente dictó sentencia absolviendo de la demanda al demandado Trías y condenando al otro deman-

dado Stubbe a pagar al demandante la suma reclamada o sean $27,936.86.

' Contra esa sentencia interpusieron apelación el demandante Gandía en cuanto a la parte de la misma que absolvió al demandado Trías y el demandado Stubbe en cuanto por ella fué condenado al pago de la cantidad expresada. Consideraremos ambos recursos en esta opinión y los resolveremos por una sola sentencia.

En la demanda se alegó, en resumen:

1, que demandante y demandados son mayores de edad, no tienen incapacidad civil y residen en el Distrito Judicial de San Juan, P. R.

2, que el demandante y el demandado Stubbe eran los únicos socios de la mercantil de esta plaza Gandía & Stubbe y habiendo convenido en disolverla dispusieron que se practicase un inventario y balance de los negocios de la sociedad, el que fué verificado por el tenedor de libros de la casa, Arturo Trías, en 18 de julio de 1916, con la cooperación del cajero de la misma Federico Stubbe y bajo la dirección y consejo del demandado Stubbe, teniendo por objeto el balance cerrar los libros y con él como base proceder a la disolución. En el dicho balance aparece que a su fecha existían en caja $2,076.87 y se debían a los bancos $154.88.

3, que el 24 de julio de 1916 otorgaron ambos socios la escritura de disolución, retrotrayendo sus efectos a la fecha del balance.

4, que en la misma escritura fué declarada la sociedad en liquidación, designándose liquidador a Arturo Trías.

5, que no obstante hallarse pendientes de pago algunas deudas, se convino el reparto de determinados bienes entre los 'socios, expresándose en la cláusula novena de la escritura las razones que existían para ello.

6, que disuelta la sociedad, el socio J. D. Stubbe y Federico Stubbe constituyeron otra sociedad mercantil bajo la

razón de Stubbe Brothers con oficinas en Tanca 9, de esta ciudad, y allí se trasladó, llevando consigo todos los libros de la contabilidad, el liquidador Trías. El socio Gandía, continuó en el antiguo local de Gandía & Stubbe.

7, que el liquidador no cumplió con el deber legal de formar y comunicar a los socios el inventario del haber social y el balance de las cuentas de la sociedad en liquidación.

8, que el liquidador Trías remitió a Gandía un estado de las operaciones desde 24 de julio a 1 de agosto 1916, según el cual existían en caja $893.70 y en el American Colonial Bank $671.79, remitiendo luego tres estados más abarcando las operaciones hasta el 25 de septiembre de 1916.

10, que Gandía reclamó $14,234.06 que debía percibir así: del liquidador, $8,234.06 de dividendos declarados de la Porto Rico Fertilizer Company, y de J. D. Stubbe $6,000 importe de sesenta acciones de la misma corporación, propiedad particular de Gandía que éste se comprometió a vender a Stubbe en la escritura de disolución. El resultado fué negativo habiéndosele informado "que dichas sumas debían pasar a poder del liquidador para extinguir las obligaciones de la sociedad, puesto que le habían sido adjudicadas a Stubbe en la escritura social."

En vista de ello el demandante promovió el pleito No. 9434 contra J. D. Stubbe para anular la escritura de disolución y el pleito No. 9436 contra la Porto Rico Fertilizer Company para cobrar los dividendos.

11, que en el dicho pleito contra Stubbe el demandante obtuvo la inspección de los libros y por el resultado de la misma y su conocimiento personal de los hechos formuló la demanda original en este pleito en reclamación de perjuicios y en solicitud de la destitución del liquidador. Luego el demandante solicitó y la corte acordó el nombramiento de un síndico que se hizo cargo de la liquidación de Gandía & Stubbe y continuó la investigación pericial de los libros.

Y con los últimos datos obtenidos, el demandante enmienda los cargos contenidos en la demanda original, así:

A, el incumplimiento por parte de Trías de sus deberes como liquidador, al dejar de remitir a Gandía el balance y los estados de cuentas a partir del 25 de septiembre de 1916. Y alega el actor que estas omisiones fueron premeditadas y maliciosas para ocultar los fraudes de que era víctima Gandía en la liquidación.

B, Trías omitió en los estados todas las operaciones de la casa del 18 al 24 de julio de 1916.

C, Trías con conocimiento de que Gandía & Stubbe en 18 de julio de 1916 tenía en los bancos $6,685.21, hizo constar, no obstante, en el balance que Gandía & Stubbe adeudaba a dichos bancos $154.88. Y el demandante alega que esta contradicción constituye una ocultación maliciosa y premeditada del liquidador verificada con la intención de sustraer de la liquidación la dicha suma de $6,685.21.

D, Trías, en 31 de agosto de 1916, practicó un asiento anulando un cargo que dijo haberse hecho por error en 29 de marzo de 1915, por virtud del cual reapareció en la cuenta de bancos el haber de $2,240 que él había hecho desaparecer en los mismos libros. Esa mutación constituye una ocultación maliciosa sin conocimiento y en perjuicio de Gandía.

E, Trías, en 11 de agosto de 1916, verificó un asiento haciendo aparecer como acreedores, en esa fecha, de Gandía & Stubbe, a los siguientes: Sucesores de C. y J. Fantauzzi, $5,665; Fajardo Sugar Company, $2,712.50; Yabucoa Sugar Company, $3,221.24; M. Zavala & Cía, $9,585.05 y Antonio Olivari, $1,432.22, no obstante constarle que no eran tales acreedores. Y tal asiento lo verificó Trías en combinación con J. D. Stubbe, haciendo constar èn el mismo lo que sigue: "del pago de estos acreedores se hacía cargo dicho Sr. Stubbe," todo para defraudar a Gandía.

F, Trías, no obstante constarle que a Gandía & Stubbe le pertenecían $10,104.40 procedentes de dividendos decla-

rados de la Porto Rico Fertilizer Company desde el balance de 29 de mayo de 1915, consignó falsamente en el libro diario de Gandía & Stubbe en 21 de julio de 1916, el siguiente asiento: "Gandía & Stubbe en liquidación a Dividendos de la Porto Rico Fertilizer Company. Anulación del cargo hecho a la Cta. 2a. en julio 31, 1915, por tratarse de dividendos no distribuídos, ni aún declarados por la compañía, $10,104.40."

Y alega el actor que no obstante haberse hecho ese asiento tres días después de la fecha a que se retrotrae la escritura de disolución, en ésta aparece Gandía & Stubbe como deudora con un saldo falso de $10,090.05 en vez de aparecer Dividendos de Porto Rico Fertilizer Company como deudor a Gandía & Stubbe del verdadero saldo de $10,104.40, y alega además el actor que esas simulaciones fueron practicadas para defraudarle en la mitad que le correspondía como socio de Gandía & Stubbe.

G, Trías no obstante saber que en la escritura de disolución se adjudicó a cada socio la suma de $8,234.06, mitad de los dividendos de la Porto Rico Fertilizer Company correspondientes a 1916, practicó en 30 de noviembre de 1916, en el libro diario, el siguiente asiento: "J. D. Stubbe, Cuenta liquidación. ½ de la cuenta de dividendos de Porto Rico Fertilizer Company que el segundo cede y traspasa al primero de acuerdo con la escritura de 24 de julio pasado ante el notario Cay. Coll Cuchí, $8,234.06."

Y el demandante alega que esta simulación la realizó el liquidador Trías de acuerdo con Stubbe para defraudar al demandante en beneficio de Stubbe en la totalidad de dicha suma.

H, e I. Que Trías, excediéndose en sus atribuciones, otorgó ciertas escrituras rectificando otras relativas a ciertos solares situados en Miramar.

12, que reasumiendo los perjuicios, que con arreglo a las

precedentes alegaciones, los demandados han causado al demandante, se relacionan así:

Mitad correspondiente a Gandía en los $6,685.21 sustraídos de los bancos, $3,342.60;

Mitad correspondiente a Gandía en los $22,616.01 de las acreencias supuestas que se hicieron aparecer en el asiento del Diario No. 10, en 11 de agosto de 1916 y que fueron transferidas a J. D. Stubbe por el mismo asiento, $11,308;

Mitad correspondiente a Gandía en los $10,104.40 de dividendos del año 1915 declarados de la Porto Rico Fertilizer Company que fueron sustraídos mediante el asiento falso practicado en el Diario en 21 de julio de 1916, $5,052.20, y

Mitad correspondiente a Gandía en los $16,468.12 de dividendos del año 1916 declarados por la Porto Rico Fertilizer Company, sustraída dicha mitad a Gandía por el asiento falso de 30 de noviembre de 1916, $8,234.06, o sea en junto, la suma de $27,936.86.

La demanda termina con la siguiente súplica:

"Solicita de la honorable corte se sirva dictar sentencia declarando con lugar esta demanda y ordenar que Arturo Trías quede destituído del cargo de liquidador de la sociedad Gandía & Stubbe, con las responsabilidades consiguientes, y condenar a dicho Trías y a Johann D. Stubbe a estar y pasar por dicha destitución y a indemnizar, solidaria y mancomunadamente, al demandante Pedro Gandía, todos los perjuicios que ambos le han ocasionado con los fraudes alegados y, en tal concepto, a pagarle la suma de $27,936.86 y condenarles también a pagar las costas de este pleito, incluyendo cinco mil dollars para honorarios de abogado del demandante."

Planteado así el debate por el demandante en su demanda enmendada, contestaron conjuntamente los demandados Trías y Stubbe, en resumen, lo que sigue:

1, que aceptan el hecho primero de la demanda.

2, que aceptan el segundo, excepto en cuanto afirma que el balance se practicó con la cooperación de Federico Stubbe y bajo la dirección y consejo de J. D. Stubbe, cuyos hechos

niegan; alegando específicamente que dicho balance fué hecho sin intervención de Federico Stubbe y bajo la autoridad de ambos socios Gandía & Stubbe.

3, 4 y 5, que aceptan los hechos 3, 4 y 5 de la demanda.

6, que es cierto que una vez otorgada la escritura de disolución J. D. Stubbe y Federico Stubbe constituyeron la mercantil Stubbe Brothers, estableciéndose en Tanca 9, a cuya oficina fué el liquidador no por iniciativa de Stubbe sino de Gandía y no con todos los libros sino con los necesarios para la liquidación.

7, que niegan el hecho 7 y alegan que si Trías no envió a Gandía el inventario y balance fué porque estaban ya practicados al disolverse Gandía & Stubbe, y que Trías rindió cuentas a Gandía y le exigió varias veces su conformidad, hasta que se estableció la demanda en este pleito.

8, que aceptan el hecho octavo.

9, que es cierto que Trías no remitió a Gandía cuentas después del 25 de septiembre de 1916, pero niegan que Gandía estuviera privado de informes, pues el liquidador estaba siempre dispuesto a rendirlos; que Trías renunció el cargo de liquidador estando en la actualidad la firma en manos de un liquidador judicial nombrado por la corte.

10, que niegan el hecho décimo de la demanda y alegan que nada les ha reclamado el demandante; que Stubbe por la escritura de disolución "se obligó con el demandante Pedro Gandía a pagarle la cantidad que resultare a favor del demandante Gandía después de hecha una liquidación de la firma social, y teniendo en cuenta las adjudicaciones de bienes que en dicha escritura de disolución se habían hecho a cada uno de los socios;" que no es verdad que Stubbe se obligara a pagar a Gandía seis mil dólares por sesenta acciones de la Porto Rico Fertilizer Company. Tales acciones pertenecían a la sociedad Gandía & Stubbe y no al socio Gandía; que los $8,234.06 a que se refiere el hecho décimo no correspondían a los dividendos declarados de sesenta ac-

ciones sino que representaban el cincuenta por ciento de los
dividendos correspondientes a doscientas cincuenta acciones
propiedad de Gandía & Stubbe, habiendo abonado Trías a
Gandía la dicha suma de $8,234.06; que no es cierto que el
abogado de Stubbe manifestara a Gandía que esas sumas
debían pasar a poder del liquidador para extinguir las obli-
gaciones de la sociedad, y que Stubbe estuvo y está dispuesto
a abonar a Gandía la cantidad que resulte adeudarle con
arreglo a la liquidación.

11, que niegan el hecho 11 y alegan específicamente, en
resumen, lo que sigue:

A, Trías rindió cuentas y nada premeditadamente omi-
tió. (Los cargos de fraude se niegan específicamente en éste
y en los siguientes apartados);

B, si bien la disolución fué retrotraída a la fecha del ba-
lance, Trías no se hizo cargo de la liquidación hasta el 24 de
julio, constando las operaciones que se hicieron desde el 18
al 24 de julio en los libros de Gandía & Stubbe;

C, que Trías no era el cajero sino el tenedor de libros de
Gandía & Stubbe y practicó el balance de acuerdo con los
libros. En la escritura de disolución se repartieron entre
los socios todos los valores de la firma, menos los que esta-
ban por necesidad sujetos a liquidación, pasando el haber
de la caja y bancos a la liquidación. No existió contradic-
ción maliciosa verificada para sustraer la suma de $6,685.21,
ni otra alguna, de los bancos;

D, el asiento de 31 de agosto, 1916, fué hecho para sub-
sanar un error de contabilidad procedente de otro asiento
de 29 de mayo, 1915. Trías no sabía cuál era la cantidad
existente en los bancos. Fué cuando tuvo en su poder como
liquidador la libreta del Banco Colonial que se dió cuenta
del error existente y lo corrigió;

E, niegan que Trías verificara el asiento en el cual fal-
samente se hiciera aparecer a las personas que se nombran

como acreedores de ''Gandía & Stubbe'' y específicamente alegan que el 11 de agosto de 1916, Trías abonó a la cuenta de J. D. Stubbe, por haberlas pagado el dicho Stubbe, las cuentas dichas, ascendentes en junto a $22,616.01. Gandía & Stubbe eran administradores de la Porto Rico Fertilizer Company y como a veces estaban necesitados de dinero tomaban el de la corporación y luego lo pagaban. Al practicarse la disolución las personas indicadas habían pagado sus cuentas a la Porto Rico Fertilizer Company, pero ésta no había recibido el dinero porque había sido ingresado en la caja de Gandía & Stubbe figurando en tal virtud dichas personas como acreedoras de Gandía & Stubbe conviniéndose entonces ''en que como quiera que en la adjudicación todas las acciones de la Porto Rico Fertilizer Company, y los negocios de esta corporación serían asumidos por el socio Sr. Stubbe, éste se encargaría de pagar a la Porto Rico Fertilizer Company esas sumas, y en cambio le abonaría a su cuenta en la liquidación; habiendo efectivamente el socio Sr. Stubbe pagado después de la liquidación todas esas cuentas en dinero efectivo a la corporación Porto Rico Fertilizer Company;

F, el abono de $10,104.40 a Gandía & Stubbe como dividendos de la Porto Rico Fertilizer Company fué un abono equivocado pues dicha suma no se ha repartido y figura aún en los libros de la corporación como ganancias sin repartir, y el asiento se practicó de común acuerdo entre demandante y demandado para subsanar un error de contabilidad;

G, la suma de $8,234.06 a que se refiere este apartado es la misma de que hace mención el hecho décimo, habiéndola Trías abonado a Gandía en la liquidación;

H, e I. Trías acepta que otorgó las escrituras de rectificación de referencia, haciéndolo en su carácter de liquidador;

12, que niegan este hecho que constituye un resumen de las alegaciones de la demanda.

Y por todo ello los demandados suplicaron a la corte que desestimara la demanda condenando al demandante al pago de las costas, gastos, desembolsos y honorarios de abogado.

Trabada así la contienda, fué el pleito a juicio, dictando finalmente la corte la sentencia de que se deja hecho mérito. En el curso de la opinión que el juez sentenciador emitiera para fundar su fallo, aparecen declarados probados los siguientes hechos:

"Primera: Que el día 27 de junio de 1916 había depositada en el American Colonial Bank a favor de la firma 'Gandía & Stubbe' la suma de $9,118.14, que unida a otras que en el propio mes de junio fueron incluídas en los libros de Caja de Gandía & Stubbe, ascendían a $47,025.43, y cuya suma al ser trasladada al Libro Mayor, se redujo a $42,025.43, existiendo, por tanto, una diferencia de $5,000 con el dinero que había en el referido banco.

"Que en la cuenta de bancos de la casa Gandía & Stubbe los bancos tenían un crédito contra Gandía & Stubbe por valor de $35,645.35, el cual, al ser también pasado al Libro Mayor, que fué el que sirvió de base para hacer el balance en que se fundó o del cual partió la liquidación que se hizo de la sociedad, lo fué por $36,145.35, apareciendo, por tanto, un abono de más a los bancos de $500, y figurando entonces los bancos como acreedores de Gandía & Stubbe cuando en verdad no lo eran.

"Que en los momentos de practicarse la disolución y liquidación de la Sociedad Gandía & Stubbe, no aparecía en los bancos, según los libros, y especialmente en el American Colonial Bank, la cantidad de $2,240.09, y el demandante, desde luego, como en la liquidación no se hizo mérito de ello, no pensó en su existencia, y sin embargo, en 31 de agosto de 1916, o sea posteriormente al momento de dicha disolución, el liquidador Trías, por medio de un asiento inserto en el Libro Diario, hizo aparecer dicha suma de cuya existencia no se dió tampoco conocimiento al demandante.

"Que en 18 de julio de 1916, los Bancos tenían por consiguiente, en sus cajas a favor de Gandía & Stubbe la cantidad de $6,685.21, cuya cantidad resulta de la suma de las tres partidas relacionadas en los tres párrafos anteriores, a saber: $5,000, $500 y $2,240.09, después de deducir $900 correspondientes al pago de sueldos de empleados, que por error fueron cargados en la cuenta de bancos en vez de haberlo sido en la de Gastos Generales, y después de descontar tam-

bién los $154.88 que se dijo en la escritura de disolución que la firma Gandía & Stubbe debía a los bancos.

"Segunda: Que la Yabucoa Sugar Company, Fajardo Sugar Company, A. y P. Olivari Mathei, C. y J. Fantauzzi, Sucs., y M. Zavala & Co., nunca fueron *acreedores* de la sociedad Gandía & Stubbe y sí *deudora* de la Porto Rico Fertilizer Company, por las mismas cantidades que se relacionan en el hecho 11°., página 8 de la demanda enmendada, y que dichos señores saldaron sus cuentas enteramente con la Porto Rico Fertilizer Company con anterioridad al otorgamiento de la escritura de disolución, que lo fué en 24 de julio de 1916.

"Tercera: Que algunas de esas cantidades fueron pagadas por los deudores a Porto Rico Fertilizer Company, muy poco tiempo antes de la disolución de la sociedad Gandía & Stubbe, según la prueba, apareciendo traspasadas al demandado Stubbe después de ocurrir dicha liquidación, en virtud de asientos realizados en los libros por el liquidador, imponiendo a dicho demandado Stubbe la obligación de pagar tales deudas, y sin que haya habido ninguna demostración de que hayan sido satisfechas o que estén aún pendientes de pago.

"Cuarta: Que en los momentos de la disolución y liquidación de la sociedad Gandía Stubbe, Porto Rico Fertilizer Company, según fué reconocido en dicha escritura, había declarado y repartido, y Gandía & Stubbe lo había cobrado, los dividendos correspondientes al año 1915, y a pesar de ello Trías, en julio 21 de 1916 y en el Libro Diario de Gandía & Stubbe, practicó un asiento anulando el cargo de $10,104.40 bajo el supuesto de que dichos dividendos no se habían declarados aún por la compañía.

"Quinta: Que los dividendos correspondientes al año 1916, ascendentes a $16,468.12, fueron declarados igualmente por la compañía y adjudicados a cada socio en la proporción de $8,234.06 para cada uno, y que el demandante no ha hecho cesión de esa mitad de dividendos a favor del demandado Johann D. Stubbe, según indica el asiento hecho por el Liquidador Trías en 30 de noviembre de 1916."

Expuesto lo que antecede, estudiemos los errores señalados por el apelante Stubbe en su alegato. La primera cuestión que levanta es la siguiente:

"Un socio no tiene causa de acción, por daños y perjuicios, mientras esté pendiente la liquidación final de la mercantil, aún después de la disolución de la misma."

Y el apelado Gandía, contesta:

"Que tal cuestión no puede considerarse en esta Corte Suprema porque se refiere a una materia que no está en *issue* por no haber sido planteada en excepción previa como base de falta de causa de acción ni tampoco en la contestación a la demanda."

Examinadas las alegaciones no consta que la cuestión fuera promovida expresamente. Los demandados aceptaron el debate tal como lo planteó el demandante. Sin embargo, del examen de la opinión de la corte sentenciadora, aparece que la cuestión fué suscitada antes del fallo, resolviéndola el juez en contra de los demandados, así:

"El demandado hace un resumen de sus conclusiones estableciendo que la demanda es prematura porque la sociedad Gandía & Stubbe está aún en liquidación; que el demandante no ha probado sus alegaciones; que no ha probado tampoco el fraude que alega y que asimismo no ha demostrado el daño.

"La primera de estas conclusiones podemos admitirla como necesaria para establecer un sistema de defensa, pero tomándola aisladamente, no es suficiente para sostener la desestimación de la demanda.

"Gandía & Stubbe terminó su contrato mercantil cuando otorgó la escritura de 24 de julio de 1916. Esta fué no una escritura de disolución, sino formalmente de liquidación de esa sociedad. Se establecieron bases, se repartieron bienes, se adjudicaron, se posesionaron de ellos los socios, y cada cual se llevó consigo lo que aquella liquidación le dió. Y tan quisieron ambos socios quedar satisfechos de la efectividad de aquel convenio, que salvaron cuidadosamente el escollo del Código de Comercio que prohibe a cada socio entrar en posesión de su haber mientras las deudas y obligaciones de la sociedad no estén satisfechas y cumplidas, y nombraron un liquidador para que hiciera pago de las sumas de poca importancia, a que alcanzaban las deudas de la sociedad, dándole en fin, al liquidador, las reglas a que debía ajustarse para ello, es decir, prometiéndole ambos socios entregarle las cantidades que le hicieran falta para cubrir estos compromisos.

"La sociedad, pues, se liquidó y ese concepto resulta de la misma escritura en conjunto y de cada una de sus cláusulas."

A nuestro juicio la cuestión pudo levantarse por excep-

ción previa, pero pudo suscitarse también, como al parecer
se suscitó, por virtud del resultado de las alegaciones y de
las pruebas al final del pleito.

El apelante cita varias decisiones en apoyo de su conten-
ción. Los hechos en que se basan esas decisiones son dis-
tintos y la jurisprudencia establecida no tiene el alcance que
se le atribuye. Nos referiremos a una de dichas decisiones,
*Riddell* v. *Ramsey et al.*, 31 Mont. 386. El apelante la trans-
cribe casi íntegra en su alegato y ella condensa admirable-
mente en verdad, la jurisprudencia sobre el particular. La
Corte Suprema de Montana copia la demanda origen del
pleito y dice:

"Esta demanda, ¿establece una causa de acción contra los de-
mandados? De una somera lectura de la misma surgen natural-
mente dudas de si su objeto fué establecer una causa de acción sobre
contrato (*assumpsit*), por apropiación, o sobre daños por la apropia-
ción indebida de fondos de la sociedad por los demandados y Roach,
mediante una conspiración fraudulenta entre ellos con tal fin. Pero
el abogado del apelado ha expresado en su alegato la teoría en que él
hace descansar la suficiencia de su demanda, y por tanto sólo consi-
deraremos si se establece una causa de acción sobre esa teoría.

"La representación del apelado dice en su alegato: 'El derecho
del demandante a entablar este pleito, tal como se expone en la de-
manda enmendada, es su derecho personal a obtener daños tortiseros
por los perjuicios sufridos por él individualmente como consecuencia
de la conspiración fraudulenta de los demandados y de los actos co-
metidos en relación con ella en perjuicio del demandante. * * *

"Uno de los requisitos esenciales de una buena demanda en una
acción de daños y perjuicios, es el demostrar mediante alegación ade-
cuada que el demandante fué perjudicado por los actos de los deman-
dados de que se queja. Se percibe que en esta demanda se alega
que Riddell (demandante), Roach y Suiter formaron una sociedad
bajo la razón social de Riddel & Roach, para construir el edificio de
la Escuela de Minas en Butte, Montana, bajo un contrato con el
Estado de Montana. No hay alegación de que alguno de los socios
contribuyera con dinero alguno o propiedad a la sociedad, o que ésta
tuviera un activo excepto el que habría de derivarse del cumplimiento
del contrato para la construcción del edificio. La demanda además

alega que fué convenido entre los socios que este activo, al ser recibido, habría de ser depositado en el Commercial National Bank of Bozeman, para ser usado exclusivamente para el pago de materiales y trabajo necesarios para la construcción del edificio, excepto que cada socio podía retirar $125 mensuales para sus gastos; que la sociedad depositó grandes sumas de dinero en dicho banco sujetas al anterior convenio, del cual Ramsey tenía conocimiento, y el cual había consentido; que los demandados y Roach, por medio de una conspiración fraudulenta, retiraron de este activo así depositado y fraudulentamente se apropiaron de la suma de $8,200 que dedicaron a su beneficio propio. Es aparente que los perjuicios denunciados son daños derivados de esta sustracción ilegal de una porción del capital social.

"¿ Cuál era el interés y propiedad de cada socio en el activo de la sociedad? 'Cada socio es dueño de toda la propiedad social, sujeta a igual dominio por cada uno de los demás socios; y ningún socio puede hacer absoluto su dominio sobre ninguna parte, o relevarla del dominio de los otros, sin su consentimiento. * * * Pero aunque ningún socio es dueño absoluto de ninguna parte de la propiedad, tiene sin embargo un interés en todo.' (*Parson on Partnership,* sec. 112.)

"El interés individual de un socio en el activo social sólo puede determinarse mediante una liquidación de la sociedad.' (*Bopp* v. *Fox,* 63 Ill. 540; *Chailer* v. *Lincoln,* 52 Ill. 74; *Menagh* v. *Whitwell,* 52 N. Y. 146, 11 Am. Rep. 683; *Sindelare* v. *Walker,* 137 Ill. 43, 27 N. E. 59, 31 Am. St. Rep. 353.)

"Tal liquidación sólo puede hacerse por convenio de los socios, o por medio de una acción en equidad para la rendición de cuentas determinantes de sus respectivos intereses. El perjuicio del demandante, como arriba decimos, se alega derivarse sólo de esta supuesta apropiación ilícita. Para que pudiera ser perjudicado como individuo por esa apropiación, su demanda debería demostrar que era individualmente el dueño, o tenía derecho a la posesión, de los fondos apropiados al tiempo de la supuesta apropiación. Las únicas alegaciones de dominio individual o derecho de posesión de los fondos que se alegan haber sido apropiados se encuentran en los párrafos 8 y 10 de la demanda. En el párrafo 8 se alega que ni los demandados ni Roach tenían derecho a ninguna parte del dinero apropiado, y que si no hubiera sido apropiado, su totalidad hubiera pasado al demandante al disolverse la sociedad y hubiera pertenecido a él libre de todo derecho de los demandados o de Roach. En el párrafo 10 encon-

tramos alegaciones al efecto de que en marzo de 1897, Roach vendió al demandante todos sus derechos en la propiedad, créditos, demandas y acciones de la sociedad y que los derechos de Roach fueron perfectamente liquidados y determinados, y que el demandante es el dueño de todos los derechos de Roach en la propiedad social; que en noviembre 26, 1897, la sociedad fué disuelta en cuanto a Suiter por mutuo convenio entre ellos, y Suiter le traspasó y cedió al demandante todos sus derechos en la sociedad y en todas las cuentas, créditos, demandas y acciones y derechos de propiedad pertenecientes a dicha sociedad y que el demandante es el dueño de toda la propiedad, derechos y acciones que hasta entonces pertenecían a la sociedad en que dichos Roach y Suiter tuvieron un interés como socios; que Roach y Suiter cedieron al demandante al terminarse y disolverse la sociedad todos los derechos de dicha sociedad en todos los fondos hasta entonces apropiados por los demandados y Roach; que al tiempo de la alegada apropiación y al tiempo de la liquidación de los negocios entre el demandante y sus socios, el total de dicha suma excedía los derechos de Roach y Suiter en dicha sociedad y en el dinero y propiedad de la misma; que al tiempo de la disolución de la sociedad sus asuntos y negocios fueron liquidados entre el demandante y Roach y Suiter, y que la suma total de dinero apropiado era una deuda y pertenecía al demandante.

''¿Son estas alegaciones suficientes para mostrar que el demandante era individualmente el dueño o tenía derecho a la posesión del dinero que se alegaba apropiado? De una lectura de las mismas se llega a la creencia de que en la redacción de la demanda los abogados del demandante intentaron apoyarse en una cesión y traspaso al demandante por Suiter y Roach de todos sus derechos de acción con respecto al dinero que se alega haber sido apropiado, o en una cesión de todos sus derechos sobre dichos fondos. Sin embargo, en su alegato dicen claramente que no basan los derechos del demandante sobre tal cesión y traspaso. Si ellos no basan los derechos del demandante sobre tales cesiones o traspasos, las alegaciones de los mismos en la demanda deben ser consideradas como superfluas. Como cuestión de derecho, el demandante no podía estar investido con un derecho de acción para reclamar la participación de Roach y Suiter en cualesquiera de los fondos así apropiados, en virtud de la cesión alegada. De acuerdo con las alegaciones de la demanda, Roach y Suiter son culpables de apropiación ilícita de fondos de la sociedad. Por tanto, ellos no podían ceder el derecho de acción para recuperar dichos fondos de ellos mismos. Ninguna persona puede traspasar a

otro un derecho de acción contra ella misma. El derecho de acción aquí ejercitado por el demandante está basado en la conducta fraudulenta de Suiter y Roach, con la concurrencia de Ramsey. No podemos concebir cómo tales derechos de acción podían, en primer lugar, existir en Suiter y Roach, porque nadie puede tener un derecho de acción contra sí mismo. Es absurdo decir que Roach y Suiter podían traspasar al demandante un derecho de acción contra ellos mismos, derivado de su propio fraude y apropiación ilícita. (*Hasselman* v. *Douglass*, 52 Ind. 252; *Van Scoter,* v. *Lafferts,* 11 Barb. 140.''

Continúa la corte en una larga revisión de decisiones en todas las cuales se establece la jurisprudencia de que en casos de esta naturaleza es necesario un balance previo, una liquidación que fije el montante de la participación de los socios en la sociedad, y dice:

''Estamos convencidos, bajo las anteriores autoridades, que las alegaciones de la demanda del actor no son suficientes para mostrar que él individualmente era dueño o tenía derecho a la posesión de los fondos que se alegan haber sido apropiados ilícitamente.

''El único perjuicio que en todo caso podría derivar el demandante de los actos de apropiación sería que el interés y dominio del demandante en la propiedad, activo y fondos de la sociedad había sido afectado y reducido. ¿Cómo puede decirse que la apropiación de parte de los fondos de una sociedad constituye un perjuicio al interés individual de un socio, antes de practicarse un balance final entre los socios, ya por medio de una demanda en equidad con tal fin o por convenio específico de los socios, y antes de determinarse que esos fondos pertenecen a dicho socio?''

En el presente caso existió la disolución de la sociedad y el balance y la liquidación, en principio, que requiere la jurisprudencia, como veremos aún con mayor claridad cuando pasemos al análisis de la prueba. Quizás no podamos llegar tan lejos como la corte de distrito al estudiar las varias reclamaciones contenidas en la demanda, pero, en términos generales, sostenemos que no es posible concluir que el demandante careciera en absoluto de causa de acción contra Stubbe a virtud de los hechos alegados. Véase el caso de

*González* v. *Alvarez*, 27 D. P. R. 462, en el que se estableció la siguiente doctrina:

"Desde el momento en que una sociedad queda disuelta y se practica la liquidación, cualquiera de los socios tiene derecho a reclamar lo que le corresponda según lo que resulte del balance."

La segunda cuestión fundamental que se levanta es la que sigue:

"La corte erró al declarar que el sistema de enjuiciamiento civil vigente en Puerto Rico permite a una corte de distrito dictar una sentencia variando la causa de acción alegada en la demanda, por cuanto que alegándose por el demandante Gandía en su demanda una acción *ex delicto,* la sentencia reconoce en dicho demandante una causa de acción *ex contractu.*"

Sostiene la parte apelada que esta corte no debe considerar este error porque de acuerdo con la repetida jurisprudencia sentada por la misma, la apelación no se da contra los fundamentos de la sentencia sino contra la sentencia misma.   Cita el apelado los casos de *González* v. *Vilella,* 24 D. P. R. 281; *Alcaide* v. *Morales et al.,* 26 D. P. R. 238; *Díaz Caneja* v. *La Administración,* 11 D. P. R. 203; *Enrich* v. *Forteza,* 18 D. P. R. 459, y *Cerra* v. *Fajardo Development Company,* 18 D. P. R. 1024.

En su opinión la corte sentenciadora dijo:

"Pero es necesario ahondar más en estos razonamientos.   Por mucho que en la demanda se exprese en su título la intención de reclamar una indemnización cuya naturaleza no conocemos hasta este momento, y por mucho que en el hecho 12°. de dicha demanda se resumen lo que se llaman *perjuicios del demandante,* y por mucho también que en la súplica de ese documento inicial de este pleito, se pida una suma de dinero como indemnización de perjuicios ocasionados a dicho demandante, a la clara inteligencia del abogado del peticionario no se puede ocultar que tomando como base lo alegado y probado en el juicio, estamos muy distantes de una acción por perjuicios causados a persona alguna.

"Y si en nuestras prácticas procesales las cosas no fueran como son en sí mismas y no como quieran llamarlas los abogados que intervienen en las contiendas judiciales, nos veríamos privados de resolver en justicia este litigio, declarando sin lugar la demanda por error de nombre de la acción entablada.

"Acciones que se promueven para reclamar indemnizaciones por perjuicios, son aquéllas en que haciéndose exclusión de lo que al demandante corresponde en justicia, se solicita el pago de una suma que representa pérdidas en sus negocios, privaciones de ganancias por cualquier concepto de utilidad, de lucro, de algo, en fin, independiente de la restitución misma de la cosa debida, porque el que da o paga lo que debe no repara un daño ni resarce de los beneficios que dejó de obtener el perjudicado.

"Aquí el demandante reclama una cantidad de $27,936.86 que es el resultado de un detenido estudio y comprobación pericial, y que está integrada por distintas partidas *que él debió haber percibido,* en la parte que a él correspondía en el momento de la liquidación, sin necesidad de acudir a la vía judicial, porque esas diferentes partidas resultaban de la contabilidad misma de la mercantil en disolución, después de un examen de los libros cuidadosamente hecho, y de rectificados los errores que por ignorancia, por equivocación o por maldad existían en dichos libros y demás documentos relacionados con la contabilidad. Lo que pide el demandante es lo que en rigor le correspondía, a nuestro juicio, y por ceñirse de una manera demasiado estricta a la reclamación de la cosa debida en sí misma, ni siquiera ha hecho una petición de intereses devengados desde la fecha en que esas sumas debieron ser entregadas a él. El que pide lo que se le debe no reclama ningún daño ni perjuicio y si lo alega, debe exigir una suma adicional que represente esos perjuicios, porque el pago de lo legítimamente debido no indemniza del perjuicio que se ocasione por no haberse hecho en la época en que debió hacerse.''

El ilustrado abogado de la parte apelante estudia con amplitud y sabiduría la cuestión envuelta. A continuación transcribimos algunos párrafos de su alegato. Dicen así:

"Dentro de estas líneas generales, el derecho inglés fué poco a poco estableciendo un número considerable de formas de acción hasta llegar a constituir verdadero impedimento a la buena administración

de justicia. Por tal motivo, en los Estados Unidos se inició una verdadera campaña para abolir esos tecnicismos, la que tuvo su primer éxito en 1848 en el Código del Estado de Nueva York, donde quedaban *abolidas* las distintas 'formas de acción' del derecho común inglés. El ejemplo de Nueva York fué seguido por otros Estados, entre ellos los del Pacífico, teniendo hoy Puerto Rico un Código de Enjuiciamiento Civil idéntico al de Idaho y California. Tal Código ha puesto en vigor el 'sistema' a que se refiere la corte de distrito en su sentencia.

"Ahora bien: ¿cuál ha sido el efecto de tal legislación? ¿Hasta dónde la abolición de las antiguas formas de acción permite a una corte separarse en su sentencia de las alegaciones contenidas en la demanda?

"Estos Códigos y todos los estatutos aboliendo las *viejas formas de acción* y las distinciones entre equidad y derecho *no alteran* el derecho sustantivo, no se *crean nuevas causas de acción* y no se destruye ninguna de las *viejas causas de acción.*

"Así, pues, en California y en Puerto Rico, por virtud de un mandato especial del Código de Enjuiciamiento Civil, todas las acciones se comienzan bien, sin tener en cuenta el nombre que el demandante les aplique con referencia a las viejas acciones del derecho común, siempre que las alegaciones del demandante contengan la exposición de una causa de acción adecuada. Es decir, que la causa de acción hay que ir a buscarla en las alegaciones."

Aplicando esos mismos principios a este caso concreto, creemos que no se ha cometido el error señalado. Conocemos la demanda. Hemos concluído que alega hechos bastantes para determinar una causa de acción. Es cierto que se alega el fraude, pero se alegan también los hechos realizados. Y analizando esos hechos es necesario concluir que actuaran o no fraudulentamente los demandados, el derecho del demandante a la reclamación sería el mismo. El demandante presentó un caso extremo. Imputó el fraude. Suponiendo que no probara el fraude pero probara la existencia de los hechos de los cuales se deriva su acción, y que tales hechos se hubieran ejecutado por error y no maliciosamente, la sentencia dentro del pleito civil sería la misma. Aún

cuando adoptáramos el criterio que adoptó la corte de distrito, esto es, prescindir de investigar y resolver si existió o no fraude, no variaríamos la causa de acción. Simplemente resolveríamos el pleito basándonos en algo que estaba comprendido dentro de las alegaciones, base y fundamento del mismo.

Hubiéramos podido quizás prescindir de estudiar en su fondo esta cuestión por el fundamento aducido por el apelado, pero nos ha parecido mejor exponer con claridad nuestro criterio.

Decididas estas cuestiones previas, pasaremos al análisis de las pruebas a los efectos de estudiar y resolver si las conclusiones de la corte contenidas en su fallo están o no sostenidas por las mismas.

Base y fundamento de todo este pleito es la escritura de disolución y liquidación tantas veces citada y en la cual ambos socios, el demandante Gandía y el demandado Stubbe, acordaron lo que sigue:

"Primero: Que por escritura número cinco, otorgada en San Juan de Puerto Rico el día veinte y tres de marzo de mil novecientos diez y seis, ante el mismo notario que autoriza este documento, acordaron ambos comparecientes la prórroga por un año más del contrato social mercantil que formalizaron ante el notario don Eduardo Acuña Aybar el día diez y ocho de abril de mil novecientos ocho, la cual fué prorrogada sucesivamente hasta fijársele como fecha en la última escritura a que me he referido, otorgada ante mí mismo el día diez y ocho de abril de mil novecientos diez y siete, estando dicha escritura debidamente inscrita en el registro mercantil.

"Segundo: Que a pesar de no haber transcurrido todavía el tiempo fijado en dicha escritura para la disolución de la sociedad, han convenido ambos comparecientes por ser así mejor a sus intereses, en terminar su conexión social disolviendo dicha firma en la forma y condiciones en que más adelante se expresará.

"Tercero: Que a los fines de efectuar dicha disolución de sociedad, se practicó el día diez y ocho de julio del año en curso un balance e inventario general de dicha firma para cerrar los libros de acuerdo con el mismo, habiendo resultado como sigue:

BALANCE DE GANDÍA & STUBBE DE JULIO 18 DE 1916.

LIBRO MAYOR.

| | | |
|---|---|---|
| Cta. No.   3.—Mobiliario | $ | 1, 014. 23 |
| Cta. No.   4.—Terrenos Trasmiramar | | 12, 104. 86 |
| Cta. No.   5.—Finca rústica | | 23, 450. 00 |
| Cta. No.   6.—Acciones Plata Sugar Co. | | 1, 406. 25 |
| Cta. No. 11.—Casa fábrica algodón | | 3, 301. 53 |
| Cta. No. 13.—Acciones Porto Rico Fert. Co. | | 25, 000. 00 |
| Cta. No. 16.—Cuenta hipotecas | | 1, 795. 06 |
| Cta. No. 18.—Dept. Comisiones, cta. Caja | | 5, 281. 17 |
| Cta. No. 19.—Caja | | 2, 076. 87 |
| Cta. No. 20.—Dividiendo Pto. Rico Fert. Co. | | 16, 468. 12 |
| Cta. No. 21.—Documentos por cobrar | | 128. 08 |
| Cta. No. 33.—Negociación ganado | | 565. 86 |
| Cta. No. 36.—Cuentas consignación | | 3, 989. 26 |
| Cta. No. 37.—Mercaderías | | 4, 055. 65 |
| Cta. No. 43.—Dept. Comisiones Cta. Especial | | 4, 821. 70 |
| Cta. No. 47.—Cuentas corrientes | | 37, 771. 21 |
| Cta. No. 51.—Acciones Central Pasto Viejo | | 800. 00 |
| Cta. No. 60.—Gandía & Stubbe, Cta. Liquidación | | 10, 000. 00 |
| | | |
| Total | | $154, 120. 55 |
| | | |
| Cta. No.   1.—Pedro Gandía, Cta. Capital | | $50, 000. 00 |
| Cta. No.   2.—J. D. Stubbe, Cta. Capital | | 50, 000. 00 |
| Cta. No. 14.—J. P. Coats, Ltd. | | 1, 325. 00 |
| Cta. No. 17.—Sun Life Ass. Co. of Canada | | 1, 082. 68 |
| Cta. No. 22.—Martin Falk, Cta. Gomas | | 562. 53 |
| Cta. No. 23.—Documento descontado | | 2, 200. 00 |
| Cta. No. 24.—Liverpool & London & Globe Ins. Co. | | 47. 53 |
| Cta. No. 26.—Cta. impuesto | | 129. 71 |
| Cta. No. 27.—The Palestine. Cta. impuesto | | 126. 66 |
| Cta. No. 42.—J. D. Stubbe. Cta. particular | | 4, 378. 11 |
| Cta. No. 44.—Bancos | | 154. 88 |
| Cta. No. 45.—J. D. Stubbe. Cta. especial | | 13, 200. 00 |
| Cta. No. 46.—Fondo de reserva | | 5, 757. 27 |
| Cta. No. 48.—Pedro Gandía, Cta. particular | | 5, 389. 51 |
| Cta. No. 50.—Cuentas por pagar | | 4, 335. 53 |
| Cta. No. 56.—Federico Stubbe | | 7, 476. 63 |
| Cta. No. 59.—P. Gandía. Cta. especial | | 7, 954. 51 |
| | | |
| Total | | $154, 120. 55 |

"Cuarto: Que ambos socios han convenido en dicha disolución y en que se efectúe en la siguiente forma:

"El activo de la mercantil será dividido entre ambos socios en la forma que se expresará específicamente en esta escritura, abonándose los resultados de la adjudicación al pasivo de la mercantil; y se

abrirá una cuenta de liquidación de Gandía & Stubbe para realizar todas las operaciones pendientes que no sean susceptibles de división inmediata entre ambos socios, las cuales se terminarán por un liquidador nombrado de común acuerdo, el cual actuará en nombre y representación de ambos socios.

"Las cuentas por cobrar y por pagar estarán a cargo de la liquidación, comprometiéndose los socios en cualquier momento a aportar las cantidades necesarias para cualquier pago que no .fuere posible hacer al liquidador procedente de deudas de Gandía & Stubbe para con terceras personas.

"Quinto: De acuerdo con el plan convenido para la disolución de la mercantil, el señor don Pedro Gandía se hace cargo de la siguiente parte del activo:

| | |
|---|---:|
| Mobiliario | $1,014.25 |
| Mitad de las acciones de Plata Sugar Co. | 702.12 |
| Cuenta hipotecas | 1,795.06 |
| Departamento Comisiones. Cta. Caja | 5,281.17 |
| Dividiendo declarado de Pto. Rico Fert. Co. | 8,234.06 |
| Mercaderías, parte de esta cta. valor de | 1,639.35 |
| Departamento Comisiones. Cta. especial | 4,821.70 |
| Mitad acciones Central Pasto Viejo | 400.00 |
| Total | $28,888.71 |

"El señor Johann D. Stubbe se hace cargo de la siguiente parte del activo:

| | |
|---|---:|
| Terrenos Trasmiramar, valor convenido de | $1,000.00 |
| Fincas rústicas, ganado y Cuenta Hacienda Julia, por valor convenido de | 17,500.00 |
| Mitad de las acciones de la Plata Sugar Co. | 703.12 |
| Casa fábrica algodón | 3,301.53 |
| Acciones de Pto. Rico Fertilizer Co. | 25,000.00 |
| Dividiendo de Pto. Rico Fertilizer Co. | 8,234.06 |
| Mitad acciones Central Pasto Viejo | 400.00 |
| Mercaderías, parte de esta cta. por valor de | 2,416.30 |
| Total | $58,555.01 |

"Pasarán a la liquidación. La diferencia entre el precio de venta de los terrenos trasmiramar entre el valor con que aparecen en el balance final y el pagado por el socio señor Stubbe.

"La diferencia entre el precio de venta de las fincas rústicas entre su valor tal como aparece en el balance final y el pagado por el señor Stubbe. La cuenta de caja. Los documentos por cobrar. Las cuen-

tas en consignación.   Las cuentas corrientes.   Y las cuentas de Gandía & Stubbe en liquidación.

"Sexto: Ambos socios han convenido en nombrar y por la presente nombran para que se haga cargo de las negociaciones pendientes estipuladas anteriormente a don Arturo Trías de San Juan.

"Séptimo: El liquidador, señor Trías, se hará cargo de los libros y abrirá las correspondientes cuentas de liquidación, cargándose a los socios señores Stubbe y Gandía la parte de activo de que se han hecho cargo, con abono a las respectivas cuentas.

"El pasivo de la firma Gandía & Stubbe será pagado por el liquidador con cargo a las cuentas correspondientes.

"Octavo: Son condiciones especiales convenidas entre los socios para efectuar esta liquidación, las siguientes:

"(*a*) El señor Gandía venderá al señor Stubbe todas sus acciones en la Porto Rico Fertilizer Company al precio de la par, quedando a favor del señor Gandía la mitad de todos los dividendos declarados por dicha compañía.

"(*b*) El señor Gandía podrá utilizar hasta el treinta y uno de diciembre de mil novecientos diez y seis la casa conocida con el nombre de fábrica de algodón, en Santurce, sin poder dedicarla a otros fines que a los que actualmente tiene, pagando al señor Stubbe los alquileres que el señor Gandía cobre por dicha casa a J. P. Coats & Co., Ltd.

"(*c*) El saldo que resultare después de la liquidación a favor de cualquiera de los dos socios se pagará por el deudor en documentos negociables de a un mil dollars cada uno, pagadero a un año plazo de la fecha de esta escritura.

"(*d*) El señor Gandía quedará con los contratos referentes a las casas y sitios de la antigua firma Gandía & Stubbe sin compensar por ello en forma alguna al socio señor Stubbe.

"Noveno: Si bien es verdad que con arreglo a las prescripciones del Código de Comercio, ningún socio podrá exigir la entrega del haber que le corresponda en la división de la masa social mientras no se hayan extinguido todas las deudas y obligaciones de la compañía, ambos socios hacen constar que estas deudas, en cuanto a terceras personas se refiere, alcanzan a sumas poco importantes que serán fácilmente cubiertas por el liquidador al liquidar los asuntos de la compañía; pero que en todo tiempo y lugar ambos serán responsables de entregar al liquidador cualquier suma que éste necesitare para el pronto pago de dichas obligaciones.

"Décimo: Todos los gastos de liquidación y disolución de la sociedad correrán a cargo de ambos ex-socios.

"Undécimo: Esta escritura se retrotraerá en sus efectos al día diez y ocho de julio próximo pasado.

"Así lo dicen, otorgan y firman después de leer cuidadosamente esta escritura y de que yo el notario les hice todas las advertencias del caso por ante mí y los testigos don Nicolás Fernández y el señor don George A. Camejo, de este vecindario, mayores de edad, sin tacha legal para serlo, de todo lo cual, yo el notario doy fe.

"En este estado y antes de firmar esta escritura, ambos comparecientes hacen constar que según los estados de la Corporación Porto Rico Fertilizer Company, existen en dicha compañía como beneficios no divididos la suma de veinte mil doscientos ocho dollars, ochenta centavos; y por la presente queda especialmente convenido que el señor Stubbe pagará al señor Gandía las cantidades que de esta suma no dividida sean declaradas de tiempo en tiempo como dividendos de dicha corporación, en la proporción de las acciones que el señor Gandía vende al señor Stubbe."

Esa escritura revela un hecho indiscutible, el de la disolución de Gandía y Stubbe. ¿Qué ocurrió después de ella? Pone de manifiesto la prueba que de acuerdo con la escritura ambos socios se separaron, en efecto, materialmente, y el liquidador nombrado se hizo cargo de la liquidación. Gandía quedó en el antiguo local con el mobiliario que se le adjudicó entre otras cosas para pagar su activo y Stubbe se estableció en la calle de la Tanca con su hermano Federico formando la nueva razón social Stubbe Brothers, y en la oficina de Stubbe Brothers se instaló el liquidador.

Transcurrió algún tiempo. Gandía pidió que se le entregaran los dividendos de la Porto Rico Fertilizer Company que se le habían adjudicado en la escritura, y que se le pagaran las acciones de la misma compañía que había vendido a Stubbe. No se accedió a su petición y se renovó el conflicto. El demandante inició entonces dos pleitos, uno contra Stubbe sobre nulidad de la escritura de disolución y otro contra la Porto Rico Fertilizer Company sobre cobro de dividendos.

En esos pleitos Gandía tuvo oportunidad de examinar por medio de peritos los libros de la antigua casa y las cuentas de la liquidación y se enteró de ciertos hechos que lo llevaron a la conclusión de que el liquidador había realizado actos que a su juicio perjudicaban sus intereses. Y entonces entabló este pleito.

¿Qué solicita aquí Gandía? Pide, en primer término, que Trías sea destituído por los actos y omisiones fraudulentos que le imputa, realizados en combinación con Stubbe, y pide, en segundo término, que Trías y Gandía le paguen los $27,936.86 que con tales actos y omisiones le defraudaron.

¿Cómo está integrada la suma total de la reclamación? Se forma de cuatro grupos, así: $3,342.60, mitad correspondiente a Gandía, en la cuenta de bancos; $11,308, mitad correspondiente a Gandía en supuestas acreencias; $5,052.20, mitad correspondiente a Gandía en los dividendos de 1915 de la Porto Rico Fertilizer Company, y $8,234.06, últimos dividendos de la Porto Rico Fertilizer Company adjudicados a Gandía.

Examinemos la primera partida, esto es, la cuenta de los bancos. Trías, nombrado liquidador, era el antiguo tenedor de libros de Gandía y Stubbe. El practicó el balance que sirvió de base a la disolución y en ese balance figura Gandía y Stubbe debiendo a los bancos $154.88. Esto no es así. Los propios peritos de los demandados admitieron en el juicio que a la fecha del balance había en los bancos la suma de $4,535.37. Los peritos del demandante fijaron el saldo en $6,685.21. Sus declaraciones ocupan cientos de páginas. Copiadas en la parte que hemos considerado más esencial, dicen:

"Dte.: Vamos ahora a la cuenta de bancos. Sírvase demostrar, con los libros a la vista, lo que pidió la corte respecto a la cuenta de bancos, es decir, el saldo de $6,685.21 que dijo Ud. el otro día que debían tener Gandía & Stubbe en los bancos el 18 de julio de 1916, a

pesar de lo ˙que consigna el balance de esa fecha, de que se debían $154.88 a los bancos.

"T.: Diario, folio 403. Hay una partida al débito de los bancos, que dice: 'Saldo cuenta American Colonial Bank en esta fecha, $2,052.81; saldo cuenta del Banco Territorial y Agrícola, $3,032.78; saldo cuenta de Lawrence Turnure Co., $372.09; total, (*sic*), $2,757.68, que es con lo que empieza la contabilidad de 29 de mayo de 1915, del balance. Después viene por 'Caja.' 'Caja, folio 656; suma total del débito de los bancos llevada al Mayor en el mes, $46,197.52 al débito, y al crédito $37,238.17. Folio 704, julio 31. Suma total al débito de los bancos llevada al Mayor en este mes, en julio 31 es: al débito $35,389.36, y al crédito, $44,334.52; folio 753 'Caja' agosto 31 del mismo año 1915. Suma total al débito del banco en ese mes, $59,817.52, y al crédito $66,281.67; septiembre 30 del mismo año, 'Caja, folio 799, suma total al débito de los bancos llevada al Mayor, $48,568.27, y al crédito $44,449.39; octubre 30, 'Caja, folio 844; suma total al débito, llevada al Mayor en ese mes, $42,046.92, y al crédito $40,784.04; octubre 30 del mismo año, 'Caja, folio 885; suma total del débito del banco llevada al Mayor en ese mes, $45,295.85, y al crédito $44,515.66; diciembre 31 del mismo año. 'Caja, folio 930: suma total del débito de los bancos llevada al Mayor, $36,785.83, y al crédito, $35,649.81. Año 1916: Enero 31, 'Caja, folio 969; suma total de débito de los bancos llevada al Mayor, $26,158.69, y al crédito $29,591.38; febrero 29 del mismo año. 'Caja, folio 1008: suma total del débito de los bancos llevada al Mayor, $39,482.03, y al crédito, $37,042.56; marzo 31 del mismo año 1916. 'Caja, folio 1051: al débito de los bancos, $59,744.72, y al haber, $58,193.93; abril 29, 1916. 'Caja, folio 1095: suma total al débito de los bancos llevada al Mayor, $49,937.37, y al haber, $40,006.31; mayo 31, 1916. 'Caja, folio 1142; suma total al débito ˙de los bancos llevada al Mayor en ese mes, $113,242.39, y al crédito, $125,821.10; junio 30 de 1916. 'Caja, folio 1170: total del débito llevado al Mayor, y que figura aquí con $47,025.43, en el Mayor figura con $42,025.43; una diferencia de $5,000.

"Dte.: ¿Cómo es esa diferencia? Que está enmendado el número este. Explíquelo bien. ¿En qué libro aparece, y con qué cantidad? En el Mayor aparece con $42,025.43, que fué lo que nosotros comprobamos.

"¿Y ahí dónde es que aparece? En el Libro de Caja aparece enmendado un número, el 2 hecho un 7, y dice $47,025.43 en el débito.

"¿Cuál es el resultado de esa alteración? Que han dejado de cargarle al banco en el Mayor $5,000.

"¿Qué trae consigo eso? Una ocultación en esa partida de $5,000.

"Siga. T.: Al haber de los bancos. *  *  *

"¿En esa misma fecha? Sí, señor, en ese mismo mes y año. Aquí tiene abonado $35,645.35 como total del mes, y en el Mayor está con $36,145.35; hay $500 de diferencia abonados de más al banco en ese mismo mes.

"Dte.: ¿Cuál es el efecto de esa segunda alteración? Que al abonarle $500 de más altera en $500 los fondos del banco. ¿Altera en qué sentido? En el sentido de ocultar $500 también del total que debía haber en el banco.

"Continúe. T.: 'Caja, folio 1184, julio 17 del mismo año. Cuenta total llevada a los bancos como débito en el mes, $25,647.93, y en el crédito, $33,196.55. ¿Cuánto suma todo eso? La suma del débito da $678,097.51, y el crédito asciende a $672,752.39. Da un balance deudor al banco de $5,345.12. ¿Qué quiere decir 'Balance deudor del banco?' Que el banco debía esa cantidad a Gandía & Stubbe en esa fecha. ¿Qué fecha? 18 de julio de 1916. ¿De modo que el saldo deudor del banco en julio 18 de 1918 era de $5,845.12? Sí, señor. A eso hay que agregar otra cantidad. ¿Qué cantidad tiene que agregar? Cantidad que se cargó indebidamente en 29 de mayo. Aquí hay una cantidad cargada al Colonial, 'Diario, folio 462, que dice: 'Error en Caja por cambio de columna. *  *  * ¿De qué fecha? 29 de mayo de 1915. $2,240.09. ¿Qué efecto produce ese asiento? Que se ha cargado a cuentas corrientes con abono al banco esa cantidad. Dice: 'Cuenta corriente, diferencia cuenta American Colonial Bank, cambio de columnas, $2,240.09. Es un asiento que no se explica; no aparece aquí cargado. Sobre esto le llamamos la atención al Sr. Trías y él nos manifestó que ese asiento había sido destruído porque obedecía a un error, y había sido destruído con posterioridad.

"Dte.: ¿Con posterioridad a la fecha que había sido hecho? Sí, señor. ¿De modo que esos $2,240.09 van *  *  *? A aumentar el débito del banco, porque si están abonados indebidamente, según confesó el Sr. Trías, van a aumentar el débito del banco en esa fecha 18 de julio.

"Ud. dijo que el Sr. Trías manifestó que ese asiento había sido destruído con posterioridad. ¿Con posterioridad a qué? Con posterioridad al balance de 18 de julio; el que debía haber figurado den-

tro del balance; quiere decir que debía estar ese saldo en esa fecha. Continúe hasta llegar a la liquidación final de la cuenta de bancos.

"T.: Después tenemos 'Descargo de la partida de $900, de 31 de marzo. ¿Eso es un descargo? Descargo por gastos generales, que ha sido cargada a los saldos en la columna de bancos. ¿Ud. dijo algo de eso el otro día? No recuerdo si lo dije; si no abonan esos $900 con cargo a los $2,240.09, el débito total sería $7,585.21 a favor de Gandía & Stubbe, pero como se abonan $900, se reduce a $6,685.21, que se distribuirían en esta forma: American Colonial Bank, $4,584.79 Lawrence Turnure Co., $1,807.02, Banco Territorial y Agrícola, $293.40: total, $6,685.21. ¿Qué dice Ud. debían tener Gandía & Stubbe en los bancos el 18 de julio? Sí, señor. ¿Cómo se explica que en el balance general se consigna en esa fecha que Gandía & Stubbe estaba debiendo a los bancos $154.88, cuando debía haber esa cantidad que Ud. acaba de manifestar, o sea $6,685.21? Debido a las ocultaciones esas que han sido llevadas al Mayor. El balance fué hecho por los saldos del Mayor, que determinan un saldo de $154.88. Tengo la demostración de los saldos de los bancos en el Mayor también.

"Dte.: Haga la demostración de los saldos del Mayor en el banco.

"T.: 'Cuenta de banco en el Libro Mayor, cuyo saldo se tuvo en cuenta para el balance general de 18 de julio de 1916, al separarse los socios Gandía & Stubbe. Partidas que figuran en el Libro Mayor, folio 148, cargadas mensualmente a la cuenta de bancos.

"Ddo.: Yo deseo hacer constar que todas estas referencias del perito al Libro Mayor son con la oposición de esta parte, porque el Libro Mayor no constituye prueba de ninguna clase ni puede ser. * * *.

"T.: Son trasladadas del Mayor a Caja con las alteraciones que he indicado.

"Dte.: Las falsificaciones constan en el Mayor.

"Ddo.: Las falsificaciones no constan en ninguna parte.

"Juez: Vamos a decir las constancias del Libro Mayor con relación al Libro de Caja. Puede continuar.

"Dte.: Siga.

"T.: Cargado al débito. Mayo 29 de 1915. Balance, $2,757.68; junio 30 del mismo año, 'Caja, folio 656, $46,197.52; julio 31 del mismo año, 'Caja, folio 704, $35,389.36; agosto 31, 'Caja, folio 753, $59,317.52; septiembre 30, 'Caja, folio 799, $48,568.27; octubre 30, 'Caja, folio 844, $42,046.92; noviembre 30, Caja, folio 885, $45,295.85; diciembre 31, Caja, folio 930, $36,785.83. Año 1916: enero 31, Caja, folio 969, $26,158.69; febrero 29, Caja, folio 1008, $39,482.03; marzo

31, Caja, folio 1051, $59,744.72; abril 29, Caja, folio 1095, $49,937.39; mayo 31, Caja, folio 1142, $113,242.39; junio 30, Caja, folio 1170, $42,025.43. Esa es la partida que ha sido alterada. 'Julio 18, Caja, folio 1184, $25,647.98. *Balance,* $154.88. Suma total: $673,252.39. Partidas anotadas al crédito del banco: Junio 30, Caja, folio 656, $37,238.17; julio 31, Caja, folio 705, $44,334.52; agosto 31, Caja, folio 753, $76,281.07; septiembre 30, Caja, folio 799, $44,449.39; octubre 31, Caja, folio 844, $40,784.04; noviembre 30, Caja, folio 885, $44,515.66; diciembre 31, Caja, folio 930, $35,649.81. Año 1916: Enero 31, Caja, folio 909, $29,591.33; febrero 29, Caja, folio 1008, $37,042.56; marzo 31, Caja, folio 1051, $58,195.93; abril 30, Caja, folio 1095, $39,006.31, más $1,000 agregados abajo, que parece que fué un error, que hace $40,006.31. Hay dos partidas aquí. Mayo 31, Caja, folio 1142, $125,821.10; junio 30, Caja, folio 1170, $36,145.35. Ahí está la alteración de los $500, y en la Caja figura $35,643.35. Julio 18, Caja, folio 1184, $33,196.55. Suma total al igual del débito, $672,252.39. Balance a favor del banco, $154.88.

"Dte.: ¿Esa es la demostración? Del saldo que sirvió para el balance de la cuenta de banco. ¿Según el liquidador? Según el balance que hicieron para separarse los socios. ¿En 18 de julio de 1916? Sí, señor."

Después de un examen cuidadoso de toda la prueba, creemos que estuvo justificada la corte de distrito al concluir que a la fecha del 18 de julio de 1916 en vez de deber Gandía y Stubbe a los bancos, tenía en ellos, según sus libros, $6,685.21. Ahora bien, ¿esta conclusión justifica el pronunciamiento de la sentencia que ordena a Stubbe que pague a Gandía la mitad de esa suma?

Volvamos a la escritura de disolución. En ella se hizo constar que el activo de Gandía y Stubbe ascendía a $154,120.55 y que sería dividido entre ambos socios en la forma que se expresaría específicamente, abonándose los resultados de la adjudicación al pasivo de la mercantil, y abriéndose una cuenta de liquidación para realizar todas las operaciones pendientes que no fueran susceptibles de división inmediata entre ambos socios, las cuales se terminarían por un liquidador nombrado de común acuerdo. Seguidamente.

se especifican los bienes del activo de que se hace cargo Gandía, ascendentes a $23,888.71, y aquéllos de que se hace cargo Stubbe, ascendentes a $58,555.01, y se expresa que pasarán a la liquidación ciertas diferencias entre precios de algunos bienes adjudicados a Stubbe y la cuenta de caja, los documentos por cobrar, las cuentas en consignación, las cuentas corrientes y las cuentas de Gandía y Stubbe en liquidación.

No se consigna expresamente en la escritura que la cuenta de bancos pasaría a la liquidación, pero como se expresa que iría a ella la cuenta de caja y como se encarga a ella el pago del pasivo y la cuenta de bancos figura en el pasivo, creemos que está justificada la conclusión de que la liquidación se hizo cargo debidamente de la cuenta de los bancos.

Esta circunstancia dificulta la solución del problema. La prueba demuestra que Trías era el liquidador. Demuestra también la prueba que Trías hizo reaparecer en los libros como existentes en los bancos $2,240. No consta claramente si se hicieron reaparecer o no con crédito a Gandía y Stubbe en liquidación los dólares que faltan para completar los $6,685.21. El perito de los demandados aseguró que los $4,535.37 que existían en los bancos a la fecha del balance y disolución, pasaron a manos del liquidador y luego a las del síndico y se fué disponiendo de ellos.

No consta aquí una cuenta final de la liquidación. La liquidación estaba aún en pie encomendada a un síndico a la fecha de la sentencia. Y no es posible llegar a una conclusión segura y justa con respecto a si los intereses de Gandía fueron o no perjudicados finalmente en ella dejando de aplicarse la suma verdadera existente en los bancos al pago de obligaciones legítimas de Gandía y Stubbe.

Sirvió el pleito para aclarar cuál debía ser esa suma, pero la evidencia no demostró cumplidamente a nuestro juicio que Stubbe se apoderara o se beneficiara de la suma correspondiente a Gandía y por tanto no creemos que esté justificada la orden de pago contenida en la sentencia.

En cuanto a Trías su responsabilidad a nuestro juicio es clara. El está obligado a rendir cuentas detalladas y justificadas de todas sus actuaciones como liquidador, y si finalmente se demostrara que había dispuesto para sí o para otra persona sin justificación aceptable, de sumas pertenecientes a la liquidación, él sería responsable de ellas. Seguramente que dentro de este mismo pleito pudo Trías haberlo explicado todo. Pero él fué demandado para pagar una suma específica de dinero sustraído por él en combinación con Stubbe de los bancos y él demostró, o dejó por lo menos en duda, que esa suma específica, o la otra que fuera en realidad la verdadera, pasó a la liquidación, que la liquidación está aún pendiente, y que hasta que su cuenta final no sea rendida, no podrá decirse la última palabra en el asunto. El derecho de Gandía es claro a exigir que la liquidación se termine, a investigar la verdad de las cuentas y a fijar la responsabilidad en que pueda haber incurrido el liquidador, pero él no puede obtener ahora en este pleito la suma específica que reclama porque esa suma puede haber sido gastada toda o parte de ella en satisfacer legalmente obligaciones suyas.

Veamos lo ocurrido en relación con la segunda partida, que está integrada por cinco cuentas diferentes. Declaró probado la corte de distrito que ni Yabucoa Sugar Company, ni Olivari, ni Sucesores de C. J. Fantauzzi, ni Fajardo Sugar Company, ni M. Zavala y Cía. fueron jamás acreedores de Gandía & Stubbe y sí deudores de la Porto Rico Fertilizer Company, habiendo pagado sus deudas a la fecha de la escritura de disolución. Esto es tan evidente que no cabe ni siquiera discutirlo.

Ahora bien, no obstante ser falso que tales entidades fueran acreedoras de Gandía & Stubbe, es lo cierto que en los libros de Gandía & Stubbe figuraban como tales, y que esas supuestas deudas ascendentes en junto a $22,616.01, estaban incluídas en las cuentas corrientes de Gandía & Stubbe, que

daban un saldo acreedor de $37,771.21 que se hizo figurar en el activo del balance de 18 de julio de 1916 que sirvió de base a la escritura de disolución. En la escritura no figura el detalle de las cuentas corrientes. Sólo aparece el saldo.

Gandía, declarando en el juicio, se mostró ignorante de los hechos. Por el contrario, el cajero de Gandía & Stubbe, Federico Stubbe, declarando también en el juicio, manifestó que todo se había hecho con conocimiento y consentimiento de Gandía y que los hechos ocurrieron, en resumen, así: Las dichas entidades compraron abonos a la Porto Rico Fertilizer Company por valor de las sumas indicadas y lo pagaron. El dinero llegó a manos de Federico Stubbe, cajero de Gandía & Stubbe; Gandía & Stubbe eran los administradores de la Porto Rico Fertilizer Company. A las personas se acusaba recibo a nombre de la Porto Rico Fertilizer Company, pero lo cierto era que las cantidades no se ingresaron en la caja de la corporación, sino en la de Gandía & Stubbe.

La prueba fué contradictoria en cuanto a lo acordado por los socios en relación con las dichas cuentas. La del demandante tendió a demostrar que Gandía, como se ha dicho, nada sabía en concreto de lo ocurrido. La del demandado que Gandía convino con Stubbe en que se encomendara a Stubbe el pago de aquellas deudas que si eran imaginarias en cuanto a las repetidas entidades, eran reales en cuanto a la Porto Rico Fertilizer Company, dándosele como es consiguiente en la liquidación un crédito igual a la responsabilidad asumida. Y que actuando de acuerdo con ese convenio fué que el liquidador Trías verificó el asiento de 11 de agosto de 1916 por el cual hizo constar que del pago de los *acreedores* Fantauzzi, etc., se hacía cargo Stubbe.

Examinada la escritura de disolución nada consta en ella expresamente con respecto a esta cuestión. El saldo de las cuentas corrientes no figura en las adjudicaciones concretas que se hicieron en la misma escritura a cada socio. Cree-

mos que el conflicto de la prueba fué bien resuelto por la corte y que no hubo ningún convenio claro y definitivo sobre el particular, aunque esto no quiere decir que Gandía ignorara por completo los hechos. Necesariamente Gandía tenía que conocerlos aunque es muy probable que como él dijo creyera de buena fe que se trataba de una cantidad muy inferior a la envuelta.

Es evidente que el asiento de 11 de agosto puede perjudicar a Gandía, pero, ¿está justificado el pronunciamiento de la sentencia mandando a Stubbe que pague a Gandía la mitad de los dichos $22,616.01?

A nuestro juicio no lo está. Creemos que lo que verdaderamente procede en este caso es anular el asiento. Es falso que Gandía y Stubbe debieran a las repetidas entidades. Siendo falsas esas acreencias, no deben subsistir y eliminadas de la columna del "Haber" en la cuenta corriente, el saldo deudor aumentará en armonía y habrá que agregar a los $37,771.21 que figuran en el activo los $22,616.01 de las cuentas. Si Gandía & Stubbe deben igual suma a la Porto Rico Fertilizer Company; si no consta de sus libros o de algún otro modo que la reintegraran en todo o en parte a dicha corporación, ya se encargará esta misma de reclamarla o no según sea su decisión o convenga a sus intereses, pero no existiendo convenio sobre el particular, no estaba autorizado el liquidador a encomendar a Stubbe el pago y acreditarlo a su cuenta en la liquidación.

Ahora bien, ¿podemos nosotros modificar el pronunciamiento de la sentencia de que se trata en la forma que hemos indicado, esto es, limitándolo a decretar la anulación del asiento de 11 de agosto de 1916 y de todos los actos derivados del mismo que pueda haber efectuado Stubbe?

La dificultad más grande que hemos tenido en el estudio y resolución de este pleito es en verdad la forma en que ha sido planteado. Todo revela una universalidad dentro de

una unidad sin que sea fácil llegar a una solución definitiva y completa prescindiendo de la universalidad y limitándose a algunos componentes de ella.

Sin embargo, siguiendo el criterio adoptado y basándonos en que lo menos está comprendido en lo más, creemos que estamos justificados en modificar la sentencia en el sentido que dejamos indicado.   Como las cuentas de los bancos, este asunto debe ajustarse por ambos socios en la liquidación créada por la misma escritura de 24 de julio de 1916.

Igual resolución es necesario adoptar en relación con la tercera partida o sea la de dividendos de la Porto Rico Fertilizer Company correspondientes al 1915.

Tales dividendos se hicieron figurar en los libros y después el liquidador por sí y ante sí sin haberse acordado nada en la escritura, ni llegado a un entendido los socios, anuló el cargo, haciendo constar que dichos dividendos no habían sido repartidos ni aún declarados por la corporación.

Realmente cuando se estudian detenidamente estos autos, no es posible dejar de concluir que Trías al encargarse de la liquidación actuó siempre en favor de Stubbe.   No hay base, a nuestro juicio, para sostener el pronunciamiento de la sentencia apelada mandando a Stubbe que pague a Gandía la mitad de dichos dividendos, pero el asiento, el hecho por el liquidador debe anularse.   Quizás esta partida tenga mucho que ver con la anterior.   Por una parte parece que Gandía & Stubbe tomaban dinero que pertenecía a la Porto Rico Fertilizer Company.   Por otra parte parece que la Porto Rico Fertilizer Company declaraba dividendos y de hecho no los pagaba a Gandía y Stubbe, o tenía aún pendiente con ésta la cuenta de administración.   Existía en los negocios de ambas entidades una confusión lamentable, incorrecta, pero no debe todo resolverse en pro de un socio y en perjuicio de otro.   Y Gandía debe tener el apoyo de las cortes no para que todo se decida en favor de él y en perjuicio de Stubbe,

pero sí para que las cosas se aclaren y se resuelvan en justicia.

La orden de pago de los $8,234.06, de los últimos dividendos de la Porto Rico Fertilizer Company debe subsistir. Esta es en realidad de verdad la reclamación que sostiene este pleito. Se trata aquí de una cuestión que adquirió forma independiente por el propio contrato de disolución. La cantidad fué claramente adjudicada a Gandía y la actuación del liquidador no quedó simplemente circunscrita a un asiento en los libros, el de 30 de noviembre de 1916, sino que basándose en él, según demuestra la prueba de los mismos demandados, Stubbe tomó para sí los dividendos que habían sido adjudicados a Gandía y los cedió a Stubbe Brothers. El liquidador y Stubbe son claramente responsables para con Gandía de esos dividendos.

Sostiene el apelado en su alegato que nada perdió Gandía porque el liquidador le abonó en la liquidación los dividendos. Esto no está claro, pero aunque así fuera, lo cierto es que por acuerdo expreso hecho constar en la escritura de disolución los dividendos se adjudicaron directamente a Gandía y a Gandía debieron ser inmediatamente entregados.

Suscitáronse en el juicio por los demandados muchas cuestiones con motivo de la práctica de la prueba. Estudiadas dichas cuestiones que son casi todas de igual naturaleza y habida en consideración la actitud de los propios demandados al practicar su prueba, creemos estar en condiciones de afirmar que si algún error técnico pudo cometerse, tal error no fué perjudicial al apelante.

Excepción hecha del que se refiere a la destitución del demandado Trías como liquidador de Gandía & Stubbe, hemos ya expuesto nuestro criterio en relación con los errores alegados en su apelación por el demandante Gandía. Sostuvo el juez sentenciador que no era ''necesario hacer ningún pronunciamiento sobre la destitución del liquidador Trías,

porque éste no lo era desde algún tiempo antes de la celebración del juicio.'' Eso no obstante insiste Gandía en que debe decretarse la destitución.

Cuando se contestó la demanda se alegó en la contestación que Trías había renunciado el cargo de liquidador. Trías se adelantó, pues, a lo pedido por el demandante y la corte de distrito actuó desde entonces al parecer bajo la creencia de que ese extremo había quedado decidido, sobre todo, después que nombró el síndico sucesor de Trías. Siendo esto así, opinamos que no existe el error que se alega.

Ahora bien, el hecho de la renuncia no libera a Trías de las responsabilidades contraídas, y ya dejamos fijada la extención de esas responsabilidades.

Por virtud de todo lo expuesto y resolviendo ambos recursos, la sentencia apelada debe revocarse y dictarse otra de conformidad con los principios establecidos y conclusiones sentadas en esta opinión.

Este complicado asunto es un ejemplo de las dificultades, de las pérdidas materiales y de los trastornos morales que produce la falta de armonía entre dos hombres que por muchos años trabajaron unidos con un fin común. Bastaría media hora de buena fe y criterio abierto y equitativo a esos dos hombres, para zanjar ellos mismos todas las cuestiones y dejarlas resueltas para siempre. Sin embargo, sesiones y sesiones de las cortes, días y días de lucha, causas criminales, largos debates forenses, voluminosos autos, han tomado el lugar de aquella media hora feliz, todo ello para lograr obtener una sentencia que si bien resuelve en definitiva el pleito, deja aún pendientes de aclarar y fijar en la práctica varias cuestiones.

*Revocada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf, Aldrey y Hutchison.